# EXHIBIT B

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4   ALPHA GRP, INC.,                    )
                                         )
 5                  Plaintiff,           )
                                         )   Case No.
 6        vs.                            )   2:18-cv-02133
                                         )   MWF-MRW
 7   SUBARU OF AMERICA, INC.,            )
                                         )
 8                  Defendant.           )
     _____)
 9

10

11                       VOLUME I

12      DEPOSITION OF COLIN DYNE, a witness herein,

13      noticed by Ballard Spahr LLP, taken at

14      2029 Century Park East, Los Angeles,

15      California, at 9:47 a.m., on Thursday,

16      August 22, 2019, before Lori S. Turner,

17      CSR 9102.

18

19

20      Job Number.: 565936

21

22

23

24

25
```

```
 1   APPEARANCES OF COUNSEL:
 2
 3   For Plaintiff:
 4   BOWSE LAW GROUP
 5   BY MICHAEL A. BOWSE
 6   801 South Figueroa Street, 25th Floor
 7   Los Angeles, California 90017
 8   213.344.4700
 9   mbowse@bowselawgroup.com
10
11   For Defendant:
12   BALLARD SPAHR LLP
13   BY NEAL WALTERS and SCOTT HUMPHREYS
14   2029 Century Park East, Suite 800
15   Los Angeles, California 90067
16   424.204.4400
17   waltersn@ballardspahr.com
18   humphreyss@ballardsaphr.com
19
20   Also Present:  CORY TYLER, Videographer
21                  TERRI CLAYBROOK
22
23
24
25
```

```
 1                  I N D E X
 2   WITNESS:  COLIN DYNE
 3   EXAMINATION BY                                 PAGE
 4   MR. WALTERS                                       7
 5
 6
 7
 8           E X H I B I T S
 9   MARKED                                         PAGE
10   Exhibit 7   Outline for Detroit Presentation   153
                (Previously marked)
11
    Exhibit 9   Email to Robert Weir from Colby    118
12              Rodriguez dated October 20, 2017,
                with documents attached
13              (Previously marked)

14  Exhibit 10  Email chain between Robert Weir     42
                and Colby Rodriguez ending on
15              October 27, 2017
                (Previously marked)
16
    Exhibit 12  Email chain between Colby           45
17              Rodriguez and Robert Weir ending
                on December 7, 2017, with
18              documents attached
                (Previously marked)
19
    Exhibit 14  Email to Henio_arcangeli           160
20              @ahm.honda.com to cdyne@redbull
                globalrallycross.com dated
21              December 20, 2017, with document
                attached
22              (Previously marked)
23
24
25
```

1  INDEX (Continued)

2

3                     E X H I B I T S

4  EXHIBIT                                                    PAGE

5  Exhibit 17   Set of email with subject                      49
                "meeting of all stakeholders for
6               RBGRC 1/15 or 1/16
                (Previously marked)
7
   Exhibit 18   Email chain between Robert Weir                51
8               and Chris Leone dated January 4,
                2018
9               (Previously marked)

10 Exhibit 23   Email to Colby Rodriguez from                  54
                Colin Dyne dated January 17,
11              2017, with forwarded email
                attached
12              (Previously marked)

13 Exhibit 32   Amended Notice of Videotaped                   11
                Deposition of Plaintiff Alpha
14              Grp, Inc. pursuant to F.R.C.P.
                (30)(b)(6)
15
   Exhibit 33   Amended Notice of Videotaped                   11
16              Deposition of Colin Dyne

17 Exhibit 34   Alpha Grp, Inc.'s Supplemental                 29
                Responses to Subaru of America,
18              Inc.'s First Set of
                Interrogatories
19
   Exhibit 35   Alpha GRP, Inc.'s Second                       29
20              Supplemental Responses to
                Subaru of America, Inc.'s First
21              Set of Interrogatories

22 Exhibit 36   Email with no "To" line, from                  73
                Colby Rodriguez, dated
23              February 5, 2018

24

25

Page 4

1  INDEX (Continued)

2

3                    E X H I B I T S

4  EXHIBIT                                                  PAGE

5  Exhibit 37   Audio transcription of                        77
                February 2018 telephone call
6
   Exhibit 38   Email chain between Helmut Wahl               89
7               and Colin Dyne dated January 19,
                2018
8
   Exhibit 39   Letter to Tomomi Nakamura from               128
9               Colin Dyne dated January 31,
                2018
10
   Exhibit 40   Letter to Hinrich Woebcken from              131
11              Colin Dyne dated February 1, 2018

12

13

14  The questions the witness refuses to answer are
    indicated in the transcript by a "[QUES]" identifier
15  at the end of the question and are located on the
    following page:
16                              189

17

18

19

20

21

22

23

24

25

Page 5

```
 1       THE VIDEOGRAPHER:  And good morning.
 2            This is the beginning of Media 1 in the
 3   deposition of Colin Dyne, individually and as
 4   30(b)(6) of Alpha GRP, Incorporated, in the matter
 5   of Alpha GRP, Incorporated, versus Subaru of
 6   America, Incorporated, held at 2029 Century Park
 7   East, Suite 800, Los Angeles, California, on
 8   August 22nd, 2019 at 9:47 a.m.
 9            The court reporter is Lori Turner, and I'm
10   Cory Tyler, the videographer, an employee of
11   Litigation Services.
12            This deposition is being videotaped at all
13   times unless specified to go off the video record.
14            Would all present please identify
15   themselves, beginning with the witness.
16       THE WITNESS:  Colin Dyne.
17       MR. BOWSE:  Michael Bowse on behalf of the
18   plaintiff, Alpha GRP, and the witness.
19       MR. WALTERS:  Neal Walters from Ballard Spahr
20   for the defendant, Subaru of America.
21       MR. HUMPHREYS:  Scott Humphreys of Ballard
22   Spahr, also for Defendant Subaru of America.
23       MS. CLAYBROOK:  Terri Claybrook, in-house
24   counsel for Subaru of America.
25       THE VIDEOGRAPHER:  And will the court reporter
```

Page 32

1  Mr. Weir.  And Mr. Weir's communications with IMG
2  led us to believe that Mr. Weir was in bed with
3  Mr. -- with IMG and had given information to IMG,
4  not just the dial-in number to IMG, but a lot of
5  other confidential information from -- from GRC,
6  Alpha GRC.
7      Q.  But as you sit here today, you still don't
8  know that Mr. Weir actually provided that call-in
9  information to IMG?
10     A.  As I sit here today, I don't have a copy of
11 the email or phone message that he provided the
12 information to IMG, correct.
13     Q.  Nor do you know whether any such email or
14 phone number exists?
15     A.  It is our belief that it does exist and it
16 did happen.
17     Q.  But you don't know one way or another
18 whether it actually does.  You have no proof of
19 that.
20     A.  I have no proof sitting here today.
21     Q.  Okay.  Let me ask you this, Mr. Dyne:
22         Do you actually know whether Subaru was
23 invited to participate in that group call?
24     A.  I believe Subaru was -- either Subaru was
25 invited or DirtFish were invited.

Page 33

```
 1      Q.  Okay.  On what do you base that?
 2      A.  Just based on the conversations I had with
 3   Mr. Rodriguez about who should be invited and who
 4   should not be invited.
 5      Q.  But it was only based on those
 6   conversations?
 7      A.  Yes.
 8      Q.  I'll represent to you that we've asked your
 9   counsel to produce -- Let me back up for a second.
10          The other witnesses in the case, I'll
11   represent to you, have testified that Mr. Rodriguez
12   would have sent an email with blind cc's to
13   participants for that group call.
14      A.  That's correct.
15      Q.  Okay.  We've asked your counsel to produce
16   a copy of the email invite that would list all of
17   the invitees for that meeting.  We have yet to
18   receive it, and I just want to repeat that request
19   here today.
20          Okay?
21      A.  Okay.
22      Q.  A moment ago, sir, you mentioned DirtFish.
23          What's the relevance of DirtFish?
24      A.  They're partners with Subaru in the racing
25   business.
```

Page 118

```
 1   BY MR. WALTERS:
 2       Q.  Now, I can walk through every one of the
 3   details, but I'm just trying to paraphrase to help
 4   you be more efficient, sir.
 5           He's talking about some of the aspects of
 6   the 2018 series to be; correct?
 7       A.  Yes.
 8       Q.  Okay.  One of the things that Mr. Rodriguez
 9   says in the third paragraph is "we've extended our
10   partnership with NBC to ensure all rounds of racing
11   are on NBC instead."
12           Do you see that?
13       A.  "Instead of...sports network."
14       Q.  "Instead of the sports network."  Do you
15   see that?
16       A.  Yes.
17       Q.  Okay.  Was it true that you'd actually
18   secured the NBC broadcast rights for the 2018 series
19   at that time?
20       A.  I'm not sure if we had secured them or were
21   negotiating with them or -- But the NBC relationship
22   was always a rolling agreement.
23       Q.  Okay.  Mr. Rodriguez says, "we've
24   extended."
25       A.  Yeah.
```

Page 119

```
 1       Q.  So you believe that you actually had the
 2   rights --
 3       A.  Yes.
 4       Q.  -- to have them broadcast?
 5       A.  Yes.
 6       Q.  Okay.
 7           So, sir, I'll represent to you that despite
 8   the thousands of pages of documents that you've
 9   produced in this case on behalf of Alpha, we don't
10   have any documents that show any engagement or
11   communication between Alpha and NBC.  And I'm going
12   to ask your attorney to search for those documents.
13           As I say that --
14       A.  You should probably search for them
15   because --
16       Q.  -- do you know --
17       A.  -- I know we used that as a keyword search,
18   so I'm not sure if "NBC" would have come up.
19       Q.  Okay.
20       A.  But just to -- for you to understand the
21   relationship with NBC, it was a longstanding
22   relationship not just with NBC, but with Red Bull as
23   well.
24       Q.  Okay.
25       A.  There was a partnership with Red Bull with
```

1  NBC with ourselves.  Red Bull took us to NBC back in
2  2014.  And I made many trips to Connecticut and
3  communicated with -- with Gary Quinn, who's the
4  vice -- VP of programming there.  And Gary and I
5  were always aligned together.
6      Q.  Can you give me Gary's last name again.
7      A.  Quinn, Q-u-i-n-n.
8      Q.  And Gary was your main contact at NBC?
9      A.  Yes.
10     Q.  What division of NBC is that?
11     A.  The sports division.
12     Q.  Is there a particular subdivision he works
13 in?
14     A.  Sports.
15     Q.  Okay.
16     A.  He's the vice president of programming.
17     Q.  So NBC broadcast in 2017 for the series;
18 right?
19     A.  Correct.
20     Q.  Were you happy with those results?
21     A.  Very.
22     Q.  Do you think the participants were?
23     A.  Absolutely.
24     Q.  Okay.  And you felt like you received the
25 value that was promised by NBC?

Page 163

1      It says, "Alicia agreed with me today that
2  the communication [had] always been."
3      What communication are you referring to
4  there?
5      A.  The communication primarily was with
6  Red Bull.
7      Red Bull was the sponsor of the Honda
8  racing team.
9      Q.  So you're not saying that Honda had made
10 those representations.
11     A.  No.  Honda had made representations to
12 Red Bull that they would continue to participate in
13 the series going forward.
14     Q.  Do you know when specifically those
15 communications took place?
16     A.  I don't know specifically.
17     Q.  Do you know who made those statements on
18 behalf of Honda?
19     A.  Alicia.
20     Q.  And to whom at Red Bull was she making
21 those statements?
22     A.  To Michael Gibbs.
23     Q.  Same questions for the communications that
24 you say took place "in recent contract
25 negotiations."

Page 164

1  That would have been by Alicia to
2  Mr. Gibbs?
3     A.  No.  "In recent contract negotiations that
4  ended with full agreement on fees due for our
5  manufacturing program" was the contract negotiations
6  directly with Honda's representative, Mr. Ken Ungar,
7  who was given the authority to negotiate on behalf
8  of Honda as a consultant.
9     Q.  Were you personally in on those
10 negotiations on behalf pf Alpha?
11    A.  I was personally involved in those
12 negotiations.
13    Q.  And are there emails that memorialize those
14 negotiations?
15    A.  There might be some, but primarily, they
16 were phone conversations.  But there was a contract.
17    Q.  There was actually a written contract
18 signed with Honda?
19    A.  There was a written contract that was ready
20 to be signed, fully negotiated.
21    Q.  Are you saying that you had another
22 writing, such as an email, which Honda said, "This
23 writing is good.  We just need to sign it"?
24    A.  Basically.
25    Q.  Okay.  To the extent that you have not

1  already done so, sir, I'm requesting that you
2  produce it.
3       A.  I don't know if it says, "This contract is
4  ready to be signed."
5           The contract that we have that was sent to
6  us from Ken Ungar was a contract that I had
7  negotiated with him all the details of.
8           I believe Colby had, you know, put some --
9  some stuff in there as well with Ken, and the
10 contract was filed.
11          And I believe you have a copy of that
12 contract.
13      THE WITNESS:  Right?
14      MR. BOWSE:  I don't know.
15 BY MR. WALTERS:
16      Q.  We'll take a look, but --
17      A.  You should.
18      Q.  -- I do make a request that you consider
19 whether there are any documents or emails that you
20 have not yet provided relating to the negotiations
21 you had with Honda in that respect.
22          As we sit here today, do you know whether
23 you reduced the fee that was proposed for Honda to
24 participate?
25      A.  Did I reduce the fee?

Page 166

1      Q.   Yeah.  Why don't we start with, do you know
2  what the fee was?
3      A.   No, I don't know the exact number.
4      Q.   Did they negotiate that fee down from the
5  original proposal of non- --
6      A.   860.  It was a bit of horse trading.
7      Q.   What did they trade on their side?
8      A.   They were trading vehicles.
9      Q.   How many vehicles had they agreed --
10     A.   I think they agreed to three trucks and --
11 and a couple minivans.
12          Not -- not in lieu of the payment.  As a
13 contributing factor with cash and vehicles.
14     Q.   Did Honda identify any concerns that were
15 associated with its decision not to go forward?
16     A.   No.
17     Q.   None at all?
18     A.   Not at all.  Zero.
19     Q.   Had they communicated those concerns to
20 you?
21     A.   Zero.
22     Q.   So you're saying their withdrawal came as a
23 surprise?
24     A.   Yes.
25          Not just to me, but to employees of Honda

Page 194

1    A.  This is yours, I assume.

2    **Q.  Yes, it is.**

3    MR. WALTERS:  That will conclude today's

4  deposition.

5    We will resume on a mutually agreeable date

6  in the next ten days.  And we've already stated the

7  logistics associated with that second day.

8    You good?

9    MR. BOWSE:  Okay.  Yeah, I'm good.

10    MR. WALTERS:  Okay.

11    THE VIDEOGRAPHER:  So this concludes the

12  deposition of Colin Dyne individually and as

13  30(b)(6) of Alpha GRP, Incorporated on August 22nd,

14  2019.

15    We are offer the video record.  The time

16  right now is 3:38 p.m.

17    (The proceedings concluded at 3:38 p.m.)

18    ***

19

20

21

22

23

24

25

Page 195

1      I, LORI S. TURNER, a Certified Shorthand

2   Reporter of the State of California, do hereby

3   certify:

4          That the foregoing proceedings were taken

5   before me at the time and place herein set forth;

6   that any witnesses in the foregoing proceedings,

7   prior to testifying, were administered an oath; that

8   a record of the proceedings was made by me using

9   machine shorthand which was thereafter transcribed

10  under my direction; that the foregoing transcript is

11  a true record of the testimony given.

12         Further, that if the foregoing pertains to

13  the original transcript of a deposition in a Federal

14  Case, before completion of the proceedings, review

15  of the transcript [  ] was [ X ] was not requested.

16         I further certify I am neither financially

17  interested in the action nor a relative or employee

18  of any attorney or any party to this action.

19         IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21  Dated:  September 2nd, 2019

22  _____

23                          LORI S. TURNER
                            CSR No. 9102
24

25